Flora Reed, appellee, v. Robert Harvey and Cora Harvey, appellants.

No. 50240.

AUGUST 15, 1961.

REHEARING DENIED OCTOBER 17, 1961.

Kennedy, Kepford, Kelsen & White, of Waterloo, for appellants.

James C. Dunbar and Melvin H. Wolf, both of Waterloo, for appellee.

GARFIELD, C. J.—This is a law action to recover for personal injuries resulting from an attack by defendants' dog. Trial ended in a jury verdict and judgment of $3344.40 for plaintiff. Defendants have appealed.

Plaintiff is a near neighbor of defendants in Waterloo. About 8:30 a.m. on September 11, 1958, defendants' collie ran into plaintiff's yard with a 20-foot chain around his neck. In an apparent attempt to protect several small children from the dog plaintiff grasped the chain, went to defendants' front steps and called Mrs. Harvey three times. The dog leaped on plain-

tiff and bit her on her right arm and left leg several times while she was retreating toward her own home. The dog tore her clothes and caused bleeding. Mrs. Harvey told her to go home and call a doctor.

As soon as plaintiff could locate a doctor (about 11:15) she saw Doctor Weyhrauch who treated her wounds that day (Thursday), on the two following days and again on Monday or Tuesday. He then told plaintiff she need not return for further treatment. In February (1959), plaintiff went to a hospital for 15 days when Dr. Bernard Diamond, an orthopedic specialist, removed the inner meniscus from the left knee and also a cystic area over an important ligament in the knee. The meniscus was partly torn before removal. Doctor Diamond testifies this operation on the knee left plaintiff with a seven per cent permanent disability.

Other evidence will be referred to later.

I. Defendants' first assigned error is that plaintiff failed to plead a cause of action either by statute or at common law. Plaintiff concedes she did not plead a cause of action at common law since she did not allege defendants were negligent or that she was free from contributory negligence at the time she was attacked. She says that throughout the trial defendants and the court understood she was relying on section 351.28, Code, 1958. Defendants in effect conceded in both their printed and oral arguments it was obvious plaintiff was claiming under this statute. So far as material, it provides:

"The owner of any dog * * * shall be liable to the party injured for all damages done by said dog, except when the party damaged is doing an unlawful act, directly contributing to said injury."

It is not suggested plaintiff was doing an unlawful act.

Plaintiff's petition does not refer to the quoted section. Defendants contend the petition is fatally defective in this respect. They rely on rule 94, Rules of Civil Procedure, which states: "Judicial notice—statutes. Matters of which judicial notice is taken need not be stated in any pleading. But a pleading asserting any statute, or a right derived therefrom, shall refer to such statute by plain designation. The court shall

judicially notice the statutes of any state, territory or other jurisdiction of the United States so referred to."

If we assume for the purpose of this case that the second sentence of this rule requires a pleading which asserts a right derived from a statute, although of our own state, to refer to the statute, we think defendants are not entitled to a reversal, under the circumstances here, because of this omission from the petition. Defendants first challenged the sufficiency of the petition in their motion for directed verdict at the close of all the evidence. They made no such motion until then but proceeded as if plaintiff had stated a cause of action under section 351.28.

When a doubtful pleading is attacked by motion, demurrer or, as permitted by rule 72, Rules of Civil Procedure, in the answer, it will be resolved against the pleader. But after issue is joined without raising any "points of law appearing on the face of the petition" (rule 72), it will be liberally construed in order to effectuate justice between the parties. The pleader will be accorded the advantage of every reasonable intendment, even to implications, regardless of technical objections or informalities. This is the effect of rule 67.

Permitting the introduction of testimony on an issue not specifically pleaded obviates the necessity of its formal presentation. Where, as here, parties proceed without objection to try an issue, even though not presented by the pleadings, it amounts to consent to try such issue and it is then rightfully in the case.

See in support of our holding on defendants' first assigned error Wilson v. Corbin, 241 Iowa 593, 604–606, 41 N.W.2d 702, 708, 709; Ashby v. School Township of Liberty, 250 Iowa 1201, 1203–1206, 98 N.W.2d 848, 851–853; Markman v. Hoefer, 252 Iowa 118, 123, 124, 106 N.W.2d 59, 63; Federated Mutual Impl. & Hdwe. Ins. Co. v. Erickson, 252 Iowa 1208, 110 N.W.2d 264, and citations in these precedents.

II. Defendants next contend plaintiff has wholly failed to show proximate causal connection between the dog's attack and the injuries sued upon.

The most serious injury complained of was to plaintiff's

left knee upon which the orthopedic specialist, Doctor Diamond, operated in February 1959. Defendants argue the only evidence of causal connection between the attack by the dog and this injury was Doctor Diamond's who, it is said, merely expressed the opinion the attack could have caused the condition he found in the knee.

At this point defendants' principal reliance is upon our decision in Bradshaw v. Iowa Methodist Hospital, 251 Iowa 375, 379–383, 101 N.W.2d 167, 170–172, and cases there cited, that "medical testimony it is possible a given injury was the cause of subsequent disability or 'could have' caused it is insufficient, standing alone, to take such issue to the jury." Bradshaw's case also points out: "However, we have held such expert evidence * * * is sufficient to warrant submitting to the jury the issue of proximate cause when coupled with other testimony, nonexpert in nature, that plaintiff was not afflicted with any such condition prior to the accident in question [citations]."

We think the issue of proximate cause was properly submitted to the jury. In considering this assigned error—and the one next considered—of course it is our duty to view the evidence in the light most favorable to plaintiff. When this is done, Doctor Diamond seems to have expressed the opinion that from the conditions he found in the knee, and the history given him by plaintiff, the attack by the dog caused such conditions—not merely that it could have caused them. Then too nonexpert testimony strengthens the opinion expressed by the doctor.

Doctor Diamond testified without objection to the history plaintiff gave him when she consulted him. "She said that a few months before there was an attack by a dog and she twisted her knee * * *." He then expressed the opinion, "Ordinarily, what provokes this sort of an injury is a twisting of the knee."

Doctor Diamond made it clear the actual dog bites had nothing to do with the condition of the knee. "It would be my conclusion that some trauma would be required to cause the tear, that is, some jolt or strain. * * * I would be attributing the injury more to the sprain of the knee and so on in getting away from the dog. * * * It is possible the sprain the patient

has undergone could have occurred in some other manner at some other time. I have no way of knowing. I have to rely on what the patient told me."

On cross-examination of Doctor Diamond defendants sought to show plaintiff's knee condition could have been caused during or before 1955 when she had a ganglion (small tumor) removed from her left foot. The doctor testified a fall could have caused the ganglion. However, there is no evidence of such a fall. The testimony is to the contrary. He went on to say, "That same fall or twist could possibly have caused the difficulty with this left knee. There is no way of knowing it didn't except the patient's statement the knee was all right, plus one other fact and that [is] * * * if this had existed from 1955 to 1959 when I saw her I think you would have a good deal of arthritic change in this knee." This seems to say that while the other cause sought to be shown was possible it was quite improbable.

Plaintiff testified she never before fractured or sprained her left leg or had it treated by a doctor and that when she had prior surgery in 1955 she had not bumped or fallen or twisted her foot. "I did not limp before the dog bit me with either the left knee or leg. After that I have limped continuously. * * * My knee started hurting immediately after the dog bit me." A sister of plaintiff said she limped the day the dog attacked her, soon after the occurrence.

On the whole, the evidence that the dog's attack caused the condition Doctor Diamond found is considerably stronger than the attempted showing of causation in Bradshaw v. Iowa Methodist Hospital, supra, 251 Iowa 375, 379–383, 101 N.W.2d 167, 170–172, relied upon by defendants, where the evidence was held insufficient.

III. Defendants contend a release signed by plaintiff and her husband and delivered to an adjuster for a company with which defendants carried insurance presents an absolute defense. Plaintiff sought to avoid the effect of the release on the ground it was a result of mutual mistake by plaintiff and the adjuster concerning plaintiff's physical condition at the time the release was executed. The issue was submitted to the jury which found in plaintiff's favor thereon.

So far as pertinent the release provides:

"We, Cecil Reed and Flora Reed, * * * for the sole consideration of $16.42 to us in hand paid, * * * have * * * released and forever discharged * * * Dr. Robert F. Harvey and Cora L. Harvey * * * from any and all claims, demands, rights, and causes of action, of whatsoever kind or nature, arising from or by reason of any and all known and unknown, foreseen and unforeseen bodily and personal injuries, loss and damage to property, and the consequences thereof, resulting, and to result, from a dog bite * * * on or about the 11th day of September, 1958 at or near 904 Beech Street, Waterloo, Iowa.

"It is further understood and agreed that this settlement is the compromise of doubtful and disputed claims, and that the payments are not to be construed as an admission of liability on the part of Dr. Robert F. Harvey and Cora L. Harvey by whom liability is expressly denied.

"This release contains the ENTIRE AGREEMENT between the parties hereto, and the terms of this release are contractual and not a mere recital.

"We further state that we have carefully read the foregoing release and know the contents thereof, and we sign the same as our own free acts.

"/s/ FLORA REED /s/ CECIL REED"

Plaintiff testified the adjuster, Mr. Don Frederick, came to her home before Doctor Weyhrauch told her (on Monday or Tuesday following the attack) she need not return for further treatment, left his card and told her to call him when the doctor released her; she did as directed; the adjuster and another man then came to plaintiff's home; he asked plaintiff where the dog bit her and she showed him the places; he asked her if her doctor released her and she told him he had; he telephoned Doctor Weyhrauch to verify the fact plaintiff had been released and his bill was $19, as plaintiff told him; the adjuster told plaintiff he would allow her $10 for clothes the dog tore and in all $16.41 "for loss of your clothes and the trouble you went through and transportation" (to and from Doctor Weyhrauch's office); the adjuster gave plaintiff two papers to sign, one to pay Doctor Weyhrauch his bill of $19, the other to pay plaintiff

$16.41 for loss of her clothes; he told plaintiff to wait a few days before returning the release to make sure the dog did not have rabies; she did as instructed. (The release recites payment of $16.42 rather than $16.41.)

Plaintiff further testified that when she signed the release she did not know she would have to undergo surgery. When asked if she then knew the serious nature of the injury to her knee, she said she knew only that Doctor Weyhrauch told her she had a sprung or pulled muscle in it.

The adjuster's testimony does not differ greatly from plaintiff's. He admitted he did not know plaintiff had a torn meniscus in her knee and said she made no complaints about difficulty with her knee other than the puncture of the dog bite. He testified the $19 was paid Doctor Weyhrauch under the medical payments coverage of the policy and the $16.42 under the liability coverage.

Plaintiff's hospital and doctor bills in connection with the surgery performed on her knee total $824.47. As stated, there is evidence—undisputed too—of permanent partial disability due to the condition of the knee.

Mr. Frederick was an experienced adjuster, a university graduate. Plaintiff had the equivalent of an eighth grade education and never had experience in legal matters.

The most thorough—and recent—discussion of which we know concerning the avoidance of a release of personal injury claims on the ground of mistake as to the extent or nature of the injuries is the annotation commencing on page 82 of 71 A. L. R.2d (1960) following the report of Clancy v. Pacenti, 15 Ill. App.2d 171, 145 N.E.2d 802, 71 A. L. R.2d 77.

This summary of the decisions on the question is there stated: There "appears to be a definite trend in most jurisdictions towards granting relief liberally where it is made to appear that an injured party released his claim under a false impression that he was fully informed as to the nature and extent of his injuries" (page 88 of 71 A. L. R.2d).

9 Wigmore on Evidence, Third Ed., section 2416, page 55, says, "In general, the modern trend is to lay down no one or more rules of thumb, but to develop a special doctrine in each

Court for that class of cases, liberally relieving the party who has signed the release."

Numerous decisions from federal courts and 29 states are cited in support of this statement in the annotation in 71 A. L. R.2d: "The general rule that a mutual mistake as to a material fact inducing the execution of a contract may be a ground for relief from its enforcement has frequently been recognized as applicable in the situation where one who has executed a release of a claim for personal injuries seeks to avoid its effect on the ground that the release was given and taken under a mutual mistake as to the nature and extent of the releasee's injuries." (Page 90 of 71 A. L. R.2d)

One of the supporting precedents cited is Jordan v. Brady Transfer & Storage Co., 226 Iowa 137, 143, 284 N.W. 73, which says of similar statements from an earlier annotation in 48 A. L. R. 1462 et seq., "The correctness of the foregoing conclusions is amply confirmed by the reported cases." To like effect is 3 Corbin on Contracts (1960), section 598, page 587.

The annotation in 71 A. L. R.2d points out that courts have frequently stated the mistake must be as to a past or existing fact and not as to future developments which are matters of opinion only (page 100). Jordan v. Brady Transfer & Storage Co., supra, also points this out (page 145 of 226 Iowa). To the same effect is 76 C. J. S., Release, section 25a, page 646.

The annotation in 71 A. L. R.2d also states: "However, while attorneys for releasees have executed great ingenuity in spelling out in detail the intention to give up all rights, known and unknown, past, present, and future, the attitude of many courts appears to be that the matter should be treated on a broad equitable basis and, conceding that the terms of the release may be evidentiary of the actual intention of the parties, those terms should not be given controlling effect, no matter how explicit they may be [page 156]."

Jordan v. Brady Transfer & Storage Co., supra, a law action, expresses this similar view, "The courts in administering equitable relief are not bound by mere terminology, and make no distinction between an unjust compromise and any other

unjust contract [page 155 of 226 Iowa]." See also Doyle v. Teasdale, 263 Wis. 328, 57 N.W.2d 381, 389; Aronovitch v. Levy, 238 Minn. 237, 56 N.W.2d 570, 576, 34 A. L. R.2d 1306; Clancy v. Pacenti, supra, 15 Ill. App.2d 171, 145 N.E.2d 802, 71 A. L. R.2d 77, 81. These precedents hold the broad terms of a release do not prevent relief therefrom on the ground of mutual mistake.

The annotation in 71 A. L. R.2d goes on to say: "The fact that the compensation received for a release was grossly inadequate for the injuries actually incurred has frequently been referred to as at least a factor indicating that the release was not understandingly given, and so supporting a claim of misrepresentation or mistake [page 165]." See in this connection our Jordan opinion, supra, also at page 155 of 226 Iowa.

The final quotation we set out from the annotation, supra, is: "The fact that at the time a release was executed there was an issue between the parties thereto as to the releasee's liability and that this issue, as well as that of the amount of damages, was compromised by the release, has sometimes been referred to as tending to sustain a release under circumstances which might otherwise justify the conclusion that it was induced by a mutual mistake or misrepresentations as to the nature and extent of the injuries [page 167]." To like effect is the Jordan decision at page 154 of 226 Iowa. There, as here, the writing signed by plaintiff recited that defendants denied liability. There, as here, other evidence indicated both the defendants and the insurance carrier thought there was no defense on the question of liability.

Unless we are to repudiate our carefully considered decision in Jordan v. Brady Transfer & Storage Co., supra, 226 Iowa 137, 284 N.W. 73, and go counter to the definite trend of current authority, we must hold it was proper to submit to the jury the question whether the release was the result of mutual mistake.

The jury could properly find this release was signed under the mistaken belief of both plaintiff and the adjuster that plaintiff's knee was not seriously injured when, in truth, she then had a torn meniscus which necessitated a serious and costly

operation; plaintiff's doctor had told both of them in effect that no further medical treatment was needed and he had released her; the nominal amount plaintiff received for the release was wholly inadequate compensation for the knee injury and indicates it was not within the contemplation of the parties —it merely covered loss of plaintiff's clothing, $6 for her trouble and 42¢ for transportation; plaintiff would not have accepted, nor would the adjuster—acting in good faith—have offered such a trifling sum had they known she then had a serious knee injury. See in this connection Doyle v. Teasdale, supra, 263 Wis. 328, 57 N.W.2d 381, 389, and citations; Clancy v. Pacenti, supra, 15 Ill. App.2d 171, 145 N.E.2d 802, 71 A. L. R.2d 77, 82.

The present case is like Jordan v. Brady Transfer & Storage Co., supra, in that the mistaken belief of the parties as to the nature and extent of plaintiff's injuries was due quite largely to the mistake of plaintiff's doctor in diagnosing the injuries. The cited case holds, "Whether the doctor making the mistaken diagnosis was the doctor of the plaintiff, or the doctor of the defendant, is immaterial, if it was a good faith diagnosis, and was in good faith relied upon [page 154 of 226 Iowa]." To like effect is Doyle v. Teasdale, supra, 263 Wis. 328, 57 N.W.2d 381, 388; 76 C. J. S., Release, section 25a, page 647.

Our case also resembles Jordan's in that the settlement was not for a lump sum but reimbursement for loss in certain known respects. Jordan was paid $530.80 for the covenant not to sue and the jury verdict was for $1500.

Incidentally, although this may be somewhat technical, we may observe that the release here purports to cover only claims resulting and to result from the "dog bite", whereas the evidence is that the dog bite had nothing to do with plaintiff's knee injury.

Defendants' main reliance in support of this assigned error is Wieland v. Cedar Rapids & I. C. Ry. Co., 242 Iowa 583, 588, 46 N.W.2d 916, 918, which upholds a lump sum settlement of $200 against a claim of mutual mistake in its procurement. The jury verdict was for $648 and defendant was permitted

to have the $200 applied on the judgment. Plaintiff's claim of a mutual mistake there was much weaker than this plaintiff's. The Wieland opinion does not repudiate Jordan v. Brady Transfer & Storage Co., supra, 226 Iowa 137, 284 N.W. 73, or anything said therein, but distinguishes it in this language because of the difference in facts:

"* * * The distinction between that and the instant case is obvious. In the Jordan case plaintiff's doctor, after setting the fractured arm (fractured in two places), mistakenly told him on September 18 the bones were uniting and that there would be complete union by December 1. On the strength of this assumed situation an agreement not to sue was made for *an amount sufficient to cover loss of wages and expense on that basis.* It later became clear there never had been or could be any union because the section of bone between the two fractures was dead and had to be removed so the live parts could be brought together to attain final union.

"In that case there was no doubt the doctor's mistake induced the settlement which was for an amount expressly computed to cover plaintiff's loss as it would have been had the doctor not been mistaken. Here there was a settlement for a lump sum having no relation to any computation based on estimated loss of time and expense. The parties clearly intended to cover future developments whatever they might be."

The italics in the above quotation appear in the Wieland opinion. We think our present case is distinguishable from the cited one on much the same basis that it distinguishes Jordan v. Brady Transfer & Storage Co. As we have tried to explain, there is evidence plaintiff's doctor mistakenly told the parties in effect that plaintiff did not need further medical treatment when as a matter of fact she then had a serious knee injury of which they were unaware. The jury could find the settlement was made on the assumption the injuries were known and for an amount sufficient only to cover the loss therefrom. It later became clear plaintiff was much in need of further medical treatment and the settlement was made on a mistaken assumption of present facts material to the agreement.

IV. There is no merit to defendants' remaining claim

of error in refusing their requested instruction and in giving instruction 7 on the issue of mutual mistake in connection with the release.

In the first place, the record shows no objection by defendants to the failure to give their requested instruction, specifying the grounds thereof, as required by rule 196, Rules of Civil Procedure, and our decisions. See Olson v. Truax, 250 Iowa 1040, 1050, 1051, 97 N.W.2d 900, 906, 907, and citations.

In the second place, the court's instruction 7 embodies the substance of the requested instruction.

Defendants objected to part of instruction 7 as "an incorrect statement of the law, that it permits the jury to vary the terms of a written instrument by parol," and for other alleged reasons not shown by the record and which we are unable to consider.

It is well settled that parol evidence is admissible for the purpose of showing a written instrument is the result of mutual mistake. Malloy v. Chicago G. W. R. Co., 185 Iowa 346, 354, 170 N.W. 481 (Ladd, J.); Aronovitch v. Levy, supra, 238 Minn. 237, 56 N.W.2d 570, 576, 34 A. L. R.2d 1306; 32 C. J. S., Evidence, section 978a and b; 20 Am. Jur., Evidence, section 1091.

Further, the part of instruction 7 complained of is carefully framed in language approved in Jordan v. Brady Transfer & Storage Co., supra, 226 Iowa 137, 152, 284 N.W. 73, and taken from an instruction previously approved in Reddington v. Blue & Raftery, 168 Iowa 34, 43, 44, 149 N.W. 933, 936.

Instruction 7 requires proof of mutual mistake by a preponderance of the evidence and in a clear and convincing manner. As previously stated, the jury specially found the release was executed because of the claimed mistake, also that it was not a mistaken opinion concerning a future development in plaintiff's condition but a mistake as to her condition when the release was executed.—Affirmed.

All JUSTICES concur except THORNTON, J., who takes no part.